**CENTRAL FOAM CORPORATION,**
Appellee,

v.

**R. M. BARRETT, Iowa Department of Job Services, et al., Appellants.**

**No. 60423.**

Supreme Court of Iowa.

May 17, 1978.

Rehearing Denied June 23, 1978.

Walter F. Maley and Blair H. Dewey, Des Moines, for appellants.

James H. Reynolds of Reynolds, Kenline, Breitbach, McCarthy, Clemens & McKay, Dubuque, for appellee.

Considered by MOORE, C. J., and REES, UHLENHOPP, HARRIS and McCOR-MICK, JJ.

HARRIS, Justice.

This appeal under the administrative procedure act concerns unemployment benefits (chapter 96, The Code) claimed by employees who left work because of a strike. The Iowa department of job services (the department) ruled on various claims following which Central Foam Corporation (the employer) petitioned for judicial review pursuant to §§ 96.6(8) and 17A.19, The Code. The trial court modified the administrative decision by disqualifying ten claimants. (The department had disqualified claimants for misconduct for a limited period only, after which their benefits were ordered paid.) The trial court in general affirmed the administrative ruling as to the remaining 41 claimants. The department and employer both appealed. We reverse on the department's appeal, affirm on the employer's appeal, and reinstate the department's administrative decision.

On March 16, 1976 the employer and 52 claimants[1], pursuant to collective bargaining, had a labor contract which contained a no strike—no lockout clause. The contract required arbitration of all grievances. On that day certain of the employer's workers refused to return following lunch break and established a picket line which was honored by the other employees. The following day the employees again refused to return to work and at noon the company informed them that those not returning to work that afternoon would be considered terminated by reason of gross insubordination. The employees however continued their strike and refused to return to their jobs. On March 23 the employer terminated all employees by written notice.

The employees applied for unemployment compensation under chapter 96, The Code. Their claims were processed through appeal and resulted in disqualifications from March 16 through March 20 for participating in a labor dispute. § 96.5(4), The Code. See *Galvin v. Iowa Beef Processors, Inc.,* 261 N.W.2d 701, 703 (Iowa 1978). Some claimant employees were penalized four weeks for misconduct pursuant to § 96.5(2), The Code. Except for such penalties the department ordered compensation paid.

The employer thereafter appealed the decision to district court pursuant to § 96.6(8), The Code. The trial court found ten of the claimants were disqualified as voluntary "quits", thus disqualifying them from benefits. The department has appealed from that ruling. The trial court on the other hand found the remaining 41 were qualified for benefits and the employer has appealed from that portion of the trial court ruling.

The department believes the federal government's preemption of labor disputes in the national labor relations act precludes any state consideration of the merits or legality of labor disputes. It is argued the act of the employer in "terminating" claimant's employment concludes the question, and preemption prevents any state speculation as to whether claimants or the employer acted properly in the dispute.

The employer argues none of the claimants are entitled to unemployment compensation because all claimants voluntarily quit. The employer stands on the employment contract with its no strike-no lockout clause and provision for arbitration.

Under these conflicting views the parties point to the definition of voluntary "quits", as contained in § 370–4.34(3), The Iowa Administrative Code which provides:

"The relationship between employer and employee continues during the period of the labor dispute unless severed by the employer or employee.

"a. If the relationship is severed by the employer, section 96.5(2) concerning discharge for misconduct shall govern.

"b. If the relationship is severed by the employee, section 96.5(1) concerning voluntary leaving shall govern."

Significantly, except as it may inhere in the awards given or denied, there has never been a specific factual finding either that the claimants voluntarily quit or that their employment was terminated by the employer. The employer complains of this failure. We must determine whether it can be found as a matter of law under the foregoing facts the conduct of the claimants amounted to a voluntary quit or that the conduct of the employer amounted to a termination. Otherwise these proceedings would necessarily be remanded for a finding of fact on the question. Normally such a question would be a factual one for the administrative agency. Our review ordinarily would be limited to determining whether the agency action is " * * * unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole; * * *." § 17A.19(8)(f); *City of Davenport v. Public Relations Board,* 264 N.W.2d 307 (Iowa 1978), and authorities.

I. The trial court did not agree completely with either the department or the employees. As to 41 employees the trial court found they had been terminated by

---

1. One claimant left employment before March 16, 1976 and is not involved in this appeal.

the employer and were entitled to benefits. As to the ten claimants named in the department's appeal the trial court allowed compensation on the basis of the national labor relations act. 29 U.S.C. 158(d) (breach of the employment contract was an unfair labor practice). The department complains vigorously against the trial court's reliance on the national labor relations act because of the preemption doctrine. This complaint is the department's first assignment of error.

Unquestionably the field of labor disputes has, with few exceptions, been preempted by the federal government. *Hollander v. Peck,* 261 N.W.2d 507, 509 (Iowa 1978); *Walles v. Intern. Bro. of Electric Wkrs.,* 252 N.W.2d 701, 708 (Iowa 1977); *Langrehr v. United Bro. of Carpenters, Etc.,* 236 N.W.2d 339, 342 (Iowa 1975).

Nevertheless we do not entirely subscribe to any suggestion that state courts must act in studied ignorance of the national labor relations act. It is one thing to defer, as we do, to the expertise of the national labor relations board in those matters in which their recognized expertise has led to federal preemption of labor disputes. It is another thing to apply unrelated state statutes, taking into account the fact that a labor dispute exists or in recognition of why it exists in order to sort out unemployment benefits.

A number of states have interpreted their unemployment compensation statutes so as to classify it as a termination by the employer and not as a quit by the worker when employment is severed under the circumstances presented in the instant case. *Special Products Company of Tenn. v. Jennings,* 209 Tenn. 316, 353 S.W.2d 561 (1962); *Jackson v. Review Board of Indiana Employ. Sec. Div.,* 215 N.E.2d 355 (Ind.1966); *Ruberoid Co. v. California Unemployment Ins. App. Bd.,* 59 Cal.2d 73, 27 Cal.Rptr. 878, 378 P.2d 102 (1963); *T. R. Miller Mill Company, Inc. v. Johns,* 261 Ala. 615, 75 So.2d 675 (1954); cf. *Sprague & Henwood, Inc. v. Unemployment Comp. B. of R.,* 207 Pa.Super. 112, 215 A.2d 269 (1965); *Robert S. Abbott Pub. Co. v. Annunzio,* 414 Ill. 559, 112 N.E.2d 101 (1953).

Such a view can be criticized on the basis of the argument the employer advances in its appeal: the claimants agreed not to strike and agreed to submit disputes for arbitration. Their violation of that provision, vital to the employer, took their employment outside the contract of employment and amounted to a "quit." In answer to the employer's argument the claimants believe the bargained contract itself was unfair and that the union did not really represent their interests. This argument leads at least toward the morass of labor disputes pre-empted by the federal government.

There is a certain logic to both positions and the question is not free from doubt. On balance however we believe the department's basic view is the one to which we must subscribe. Ultimately it appears there was nothing in the act of the claimants when they went on strike which automatically terminated the employment. They did not propose their strike as an end to the employment but for other right or wrong purposes. Indeed it is well settled a strike itself does not automatically terminate the relationship. *Dallas Fuel Co. v. Horne, et al,* 230 Iowa 1148, 300 N.W. 303 (1941). See Annot. 63 A.L.R.3d 88, 120. The termination occurred when the claimants were replaced for refusing to come back to work. *Ruberoid,* supra. The employer of course believes the replacement of the striking workers was fully justified. But we cannot, on this record, find the replacement was justified unless we do so on the same basis as did the trial court: by interpreting and applying the national labor relations act. To do so would, as the department contends, launch us into the labor field, a venture not demanded by chapter 96.

We do not suggest the employer should be left without legal rights when its contract is violated. Neither do we condone contract violations. Of course an employer may under federal law file complaint of the union's conduct to the national labor relations board. Our consideration is limited to chapter 96 benefits.

We conclude the employment of all claimants was terminated by the employer and that no claimant voluntarily quit within the definition of § 96.5(1), The Code.

Reversed on the appeal of the department, affirmed on the appeal of the employer, and remanded for entry of a decree in conformance herewith.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.

All Justices concur except UHLENHOPP, J., who concurs specially.

UHLENHOPP, Justice (concurring specially).

The facts may be taken from the agency's findings, as those findings have substantial evidentiary support. The problem relates to the legal conclusions to be drawn. The agency involved is the Iowa Department of Job Service.

With respect to the claimants who are still involved, the employment compensation claims may be divided into four groups: Group 1 consists of claims of employees who struck for economic benefits, Group 2 consists of claims of those who struck because they believed in good faith that employer Central Foam Corporation interfered with their union, Group 3 consists of claims of those who struck under duress imposed by other strikers, and Group 4 consists of claims of those who were unable to comply with the employer's order to return to work because they did not receive the order or received it too late.

Central Foam had a collective bargaining contract with Local 18, Plastic Workers Union, AFL–CIO. The contract contained a no strike-no lockout clause requiring arbitration of all grievances. On March 16, 1976, some of the claimants refused to return to work following lunch break and established a picket line; the other claimants would not cross the line. This was conduct of claimants themselves; it was not authorized or permitted by the Local's officials.

The employer had one principal customer, and production was only a day or two ahead of that customer's requirements.

On March 17, 1976, claimants repeated their performance of the previous afternoon. At noon on March 17 the employer gave notice that if claimants did not return to work in the afternoon they would be considered terminated for gross insubordination. Claimants did not return to work, and on March 23 the employer terminated the employment of all of them by written notice. The picket line remained until April 14, 1976.

Claimants filed for unemployment compensation from March 16, 1976, forward. The agency rendered a decision regarding entitlement to unemployment compensation by the claimants in the respective groups. On appeal the district court, adopting the agency's fact findings, held as the agency did that all claimants are disqualified for benefits for the period March 16 to 23, 1976, under § 96.5(4) of the Iowa Code ("An individual shall be disqualified for benefits: For any week with respect to which the department finds that his or her total or partial unemployment is due to a stoppage of work which exists because of a labor dispute"). As to benefits following March 23, 1976, the court held that claimants in Group 1 are disqualified for benefits for violating the no strike clause, under 29 U.S.C. § 158(d); that claimants in Group 2 are qualified for full benefits because the no strike clause does not apply to good faith strikes against claimed employer interference with employees' unions; and that claimants in Groups 3 and 4 are qualified for full benefits.

The agency appealed to us as to Group 1 for the period following March 16, 1976. The employer cross appealed as to Groups 2, 3, and 4 for the period following March 16, 1976.

These claims for unemployment compensation are governed by chapter 96 of the Iowa Code, more particularly §§ 96.5(1) and 96.5(2)(a). The task is to interpret those provisions, a matter of Iowa law. Section 96.5(1) provides so far as relevant: "An

individual shall be disqualified for benefits . . . [i]f he or she has left his or her work voluntarily without good cause attributable to his or her employer, if so found by the department." Section 96.5(2)(a) provides in pertinent part: "If the department finds that he or she has been discharged for misconduct in connection with his or her employment . . . [h]e or she shall forfeit one to nine weeks benefits."

The appeal involves these questions: First, under which of these quoted provisions do the respective groups fall—(a) are they "voluntary quits" under § 96.5(1) and therefore disqualified, or (b) were they "discharged for cause" under § 96.5(2)(a) and therefore qualified subject to penalty, or (c) were they "discharged without cause" and therefore fully qualified? Second, do the Supremacy Clause and federal law prohibit us from considering and deciding these questions on the merits?

I. *Status Under § 96.5 of Respective Groups.* Assuming for the moment that all claimants voluntarily struck on March 16, did they thereby quit their employment under § 96.5(1)?

A. A good argument can be made that claimants did quit. They violated the no strike clause for which the employer had bargained. Therefore they, not the employer, breached the collective bargaining contract. If employees can violate a no strike clause and then compel the employer either to accede to their demands or to discharge them and probably have the employer's account charged with their unemployment compensation, the practical value of a no strike clause appears dubious—especially if the employer ends up with both a closed plant and the burden of unemployment compensation, notwithstanding the no strike clause.

This argument however is based on traditional contract law: the employees committed a material breach of the collective bargaining contract entitling the employer to rescind. But we are not dealing in the traditional area of contracts here. We are interpreting an unemployment compensation statute, and subject to constitutional limitations and to possible loss of federal tax credits the legislature could write the statute as it wished. In traditional labor law, which is persuasive in interpreting chapter 96 under Iowa law, an employee does not usually quit by striking; the underlying employer-employee relationship subsists during the strike, unless the employer terminates the relationship someway or the strikers terminate it in some manner. *NLRB v. Mackay Radio & Tel. Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. A striker ordinarily does not want the employment terminated; he wants it improved. The Iowa legislature has not seen fit in chapter 96 to change this general concept, even in situations of no-strike clauses. Moreover, in a case under chapter 96 this court quoted a statement at odds with the concept that striking is tantamount to quitting. *Moulton v. Iowa Employment Security Comm'n,* 239 Iowa 1161, 1166, 34 N.W.2d 211, 213. There the court approvingly quoted the following from a Pennsylvania decision:

> "When we say, 'He left work voluntarily,' we commonly mean, he left of his own motion; he was not discharged. It is the opposite of a discharge, dismissal or layoff by the employer or other action by the employer severing relations with his employes . . .."

In addition, the New York Court has held that an employee's refusal to comply with his employer's demand to return to work cannot be considered a voluntary quit. *Hulse v. Levine,* 41 N.Y.2d 813, 393 N.Y. S.2d 386, 361 N.E.2d 1034.

Although a policy argument can be made for a statute the other way, we have no such statute. I conclude that striking in violation of a no strike clause is not a voluntary quit in the context of chapter 96. This means that none of the members of the four groups is disqualified for unemployment compensation as a "voluntary quit."

B. Did the employer discharge "for cause" under § 96.5(2)–(a)? That he discharged claimants on March 23 no one doubts. Again we are only concerned with the impact of the conduct, here the dis-

charge, upon claimants' entitlement to unemployment compensation under chapter 96, an Iowa law question. Here however the four groups cannot be considered together.

While an employer who discharges employees for violating a no strike clause may have his account charged with unemployment compensation paid, he *can* discharge the employees; they breached the contract. *Cheney California Lumber Co. v. NLRB,* 319 F.2d 375 (9 Cir.). Is the discharge "for cause," under § 96.5(2)(a)?

Group 1 struck for economic benefits, manifestly in violation of the no strike clause. They are therefore qualified for unemployment compensation but subject to the strictures of paragraph (a) of § 96.5(2) —forfeiture of one to nine weeks benefits. The agency set this at four weeks forfeiture, which is within its discretion.

I pass Group 2 temporarily and proceed to Groups 3 and 4. These groups struck under duress or did not get the word to return to work or get the word in time. The agency could find as it did that these employees were not guilty of misconduct which gave "cause" for their discharge under § 96.5(2)(a). They were therefore eligible for unemployment compensation without the penalty in paragraph (a) of § 96.-5(2).

Group 2 poses a special problem. This group struck in good faith because of claimed *employer* domination of the union which was supposed to represent *their* interests. The issue before the agency was not whether the employer did dominate the union. The fact question before the agency was only whether the Group 2 strikers in good faith claimed the employer dominated their union, and the agency found that they did. That fact finding raised the legal question before the agency, and now before us, whether good faith assertion of the claim by striking violated the no strike clause and thus gave the employer "cause" to discharge the strikers. This question in turn depends on whether the no strike clause encompasses a strike based on a good faith claim of employer domination of the strikers' union.

Chapter 96 itself is silent on this question. Persuasive again, although not conclusive as a matter of Iowa law, are general doctrines from labor law elsewhere. So far as the National Labor Relations Act is concerned, even the right to strike on account of claimed employer unfair labor practices can be waived by employees, provided that selection of the bargaining representative remains free. The parent decision is *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309. The waiver in the no strike clause must, however, be clear, and the more serious the unfair labor charge, the more explicit the waiver must be. *Hribar Trucking Inc.,* 166 NLRB 745, mod. sub nom. *NLRB v. Hribar Trucking, Inc.,* 406 F.2d 854 (7 Cir.); *Arlan's Dep't Store of Mich., Inc.,* 133 NLRB 802. These doctrines have weight here by analogy, in our interpretation of chapter 96.

In the present case the employer did not prove no-strike clause language which explicitly waives the right to strike for employer conduct of the kind asserted here. I conclude that Group 2 could, without violating the no strike clause, strike on the basis of the employer conduct asserted by the strikers in good faith. Hence the employer did not have "cause" for discharging Group 2 members, and they too are entitled to unemployment compensation without penalty.

II. What I have said is necessary prologue to the fundamental issue on which I part with the court majority. In my first division, I have considered the actual causes of the employment severance—launched into the labor field as the court majority puts it—based on the agency's fact findings. But the majority says this process is impermissible under the federal preemption doctrine. I think that doctrine has no application here.

Congress enacted the National Labor Relations Act, having to do with the activities of employers, employees, and employee representation, and also established the National Labor Relations Board to administer that act. 29 U.S.C. § 151 et seq. Neither

federal nor state courts can consider or determine actions which come within the administration of the NLRA by the NLRB. This area is preempted by the NLRA to the NLRB. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775.

At the same time, Congress encouraged state unemployment compensation acts. Presumably Congress could have established a comprehensive *federal* unemployment compensation system, perhaps as an appendage to the NLRA. Instead, Congress left this area to the *states.* It enacted the Federal Employment Tax Act, 26 U.S.C. §§ 3301–3309, as part of a program "to stimulate the creation of and payment to state unemployment compensation funds." *United States v. Spencer,* 65 F.Supp. 763, 764 (D.Mass.), aff'd in part, rev'd in part sub nom. *Massachusetts v. United States,* 160 F.2d 614 (1 Cir.), aff'd, 333 U.S. 611, 68 S.Ct. 747, 92 L.Ed. 968. This act imposes an excise tax on employers but gives tax credits to those who contribute to qualified state unemployment compensation systems. Iowa established a qualified system in chapter 96 of the Code.

We thus have the federal NLRA and the Iowa unemployment compensation act functioning side by side, one actually established by Congress and the other fostered by Congress by tax credits.

As part of the Iowa system of unemployment compensation, the Iowa act contains § 96.5 which deals in part with voluntary quits and discharges for cause. The act also contains § 96.10 establishing the agency to administer the act, and § 96.6(8) creating the right of judicial review. No one suggests that any of these provisions is invalid.

The NLRB has no jurisdiction to administer the Iowa unemployment compensation act, and the Iowa agency has no jurisdiction to administer the NLRA. Each of these agencies administers its own act.

From this I conclude that the Iowa agency, applying chapter 96 of the Iowa Code and therefore Iowa law, can consider all the relevant facts in making chapter 96 determinations. It is not thereby determining labor-management relations under the NLRA; *it is only determining entitlement to Iowa unemployment compensation.* If we hold that the Iowa agency must administer the Iowa act, including determination of such questions as voluntary quits and discharges for cause, but must do so without consideration of the facts because those facts might also be relevant in proceedings before the NLRB, then we are asking the Iowa agency to rule on claims blindfolded. I do not believe Congress contemplated such a situation, and I therefore believe the preemption doctrine has no application.

Thus the NLRB and the Iowa agency may pursue parallel but independent courses in a given situation. A strike may involve labor-management problems cognizable under the NLRA, and the NLRB may conduct its proceedings dealing with those problems. The same strike may give rise to problems cognizable under chapter 96, and the Iowa agency may conduct its proceedings dealing with those problems. Each body administers its own act and neither body attempts to administer the other's act. While both bodies may deal with the same issues in so doing, each body does so solely to carry out its own act. The labor laws of the United States in the NLRA are thus applied by the NLRB without interference by the Iowa agency, and preemption simply is not involved.

What I have said is of course directed to the facts presented. I do not say that refinements may not be necessary in cases I cannot visualize. Those cases must await their day.

The following decisions on related subjects give some support to my position. *New York Tel. Co. v. New York State Dep't of Labor,* 566 F.2d 388 (2 Cir.), cert. granted, 98 S.Ct. 1519, 55 L.Ed.2d 537 (U.S.); *Malone v. White Motor Corp.,* 98 S.Ct. 1185, 55 L.Ed. 443 (U.S.); *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448.

I concur in the result.